UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Rosina L. Bennett,<br><br>Plaintiff,<br><br>v.<br><br>Jacob J. Lew, Secretary of the Treasury,<br><br>Defendant. | Civil No. 12-CV-2829 (SRN/FLN)<br><br>**MEMORANDUM OPINION AND ORDER** |

Stephen M. Thompson and Tammy P. Friederichs, Friederichs & Thompson, P.A., 1120 East 80th Street, Suite 106, Bloomington, Minnesota 55420, for Plaintiff.

Friedrich A. P. Siekert, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.   INTRODUCTION

This matter is before the Court on Defendant Jacob J. Lew's[1] Motion for Summary Judgment [Doc. No. 18]. For the reasons stated below, the Court grants in part and denies in part Defendant's Motion.

## II.   BACKGROUND

This lawsuit stems from Plaintiff Rosina Bennett's employment with the Internal Revenue Service ("IRS"). The IRS hired Bennett, an African-American female, as an

---

[1] Defendant Lew became Secretary of the Treasury on February 27, 2013, and was substituted for the original defendant, former Secretary of the Treasury Timothy Geithner. (Mem. in Supp. of Def.'s Mot. for Summ. J. [Doc. No. 37] at 1 n.1.) See Fed. R. Civ. P. 25(d).

entry-level Initial Assistance Representative in the Minneapolis Taxpayer Assistance Center in August 2006.  (Bennett Dep., Vol. 1 [Doc. No. 28] at 51; Stevenson Decl. [Doc. No. 20] ¶ 6.)  Initial Assistance Representatives are assigned tasks such as greeting taxpayers, handing out forms, determining the type of assistance the taxpayer requires, and answering basic tax questions.  (Stevenson Decl. ¶ 4.)  Bennett's supervisor at the Minneapolis center was Julie Stevenson.  (Id. ¶ 6.)

In the Spring of 2008, Bennett applied for a promotion to Individual Taxpayer Advisory Specialist.  (Bennett Dep., Vol. 1 at 53.)  Bennett received the promotion in March 2008, with Stevenson's support, although she was transferred to the Bloomington location rather than her preferred choice of either St. Paul or Minneapolis.  (Id. at 41–42, 54.)  There were only two Specialists, Bennett and Thomas Cartmell, at the Bloomington center, and there were no Initial Assistance Representatives.  (Stevenson Decl. ¶ 14.)  Therefore, the Specialists were required to perform ministerial tasks such as opening boxes, filing, and maintaining office printers.  (E.g., id.; Bennett Dep., Vol. 2 [Doc. No. 29] at 36–39.)  Bennett believes she was required to complete more of these tasks than Cartmell because he is White and she is Black.  (Bennett Dep., Vol. 2 at 36–39, 43–44.)  Although Stevenson's office was located in Minneapolis, she was the manager of the Bloomington Specialists, and Bennett complained to her about having to do this work.  (Id. at 39; Stevenson Dep. [Doc. No. 35] at 7, 22–23, 30–31.)

In the Summer of 2008, and again in the Summer of 2009, Stevenson initiated a special project called the "Correspondence Project."  (Stevenson Decl. ¶ 19 & Ex. 207.)  Stevenson assigned one Specialist at each location to work on the project.  (Id. ¶ 19.)

2

Bennett states that she wanted to receive training for the project and expressed her interest to Stevenson. (Bennett Dep., Vol. 2 at 31–32.) However, Stevenson selected Cartmell from the Bloomington center. (Stevenson Decl. ¶ 19.) The employees who were selected to receive training for the correspondence project at the various locations were White, and Bennett believes that she was not selected because she is Black. (Bennett Dep., Vol. 2 at 33–36.) Bennett also believes that she was singled out by the instructor at an unrelated training in January 2009, as an example of "what not to do," because of her race. (Id. at 17–19.) When Bennett complained to Stevenson, she was reassigned to a different instructor. (Id., Ex. 24 ¶ 21.)

As Bennett's supervisor, Stevenson completed Bennett's performance reviews. For the period of June 2007 to May 2008, Bennett received a performance rating of "exceeds fully successful" or "outstanding" in the reviewed categories. (Stevenson Decl., Ex. 203 at 1.) In Bennett's mid-year review dated December 31, 2008, Stevenson rated Bennett's performance "outstanding," "fully successful," or "met" in each category. (Id., Ex. 204.) And, for the period of June 2008 to May 2009, Bennett received "fully successful," "exceeds fully successful," or "outstanding" in the reviewed categories. (Stevenson Dep., Ex. 111 at 1.) However, Bennett's overall score did not qualify her for a bonus in 2009. (Stevenson Decl., Ex. 205.) She asserts that the lower 2009 score was based on her race. (Bennett Dep., Vol. 4 [Doc. No. 31] at 20).

Bennett also asserts that her co-worker at the Bloomington center, Cartmell, often made offensive comments to her, including racially-offensive comments. (See Bennett Dep., Vol. 2 at 22–26.) For example, Bennett alleges that Cartmell referred to her as

3

"dumb" and "stupid," as his "slave," and as "Aunt Jemima." (Id. at 23–24; id., Vol. 4 at 71.)  Bennett contends that she complained to Stevenson on multiple occasions about the way Cartmell treated her.  (Bennett Dep., Vol. 2 at 21–24; id., Vol. 4 at 16–17.)  Stevenson's notes on the matter, which are undated but were apparently written in February 2010, (see Stevenson Dep. at 80–81), confirm that she "had a couple conversations . . . with Rosina Bennett where [Bennett] has indicated that she believes that she is not being treated equitably," (id., Ex. 125 at 1).  In those notes, Stevenson stated that she "understand[s] that there are some interpersonal issues between [Bennett] and [Cartmell] . . . which do need to be resolved."  (Id.)  She also noted that Bennett believed she was doing more than her share of administrative work, assisting more than her share of customers, and receiving insufficient study time and training.  (Id.)  Bennett claims that, despite her complaints, Stevenson did nothing to remedy the situation.  (Bennett Dep., Vol. 2 at 21.)

     The culmination of Bennett's interactions with Cartmell occurred on January 5, 2010—the day that Bennett alleges Cartmell threatened her with a knife in her cubicle, causing her to fall backwards onto her desk and hit her head and neck on her computer monitor.  (See id. at 44–45, 49–53.)  According to Bennett, she placed several phone calls to Stevenson that day to report the incident.  (Id. at 67–68.)  However, Stevenson did not answer the phone, so Bennett left a message stating that it was very important that they speak.  (Id. at 68.)  Bennett then contacted a union representative, but she stopped communicating with him after she discovered that he had what she believed to be a conflict of interest.  (Bennett Dep., Vol. 3 [Doc. No. 30] at 8–9.)

On January 21, 2010, Bennett met with Steve Soria, who she knew was Stevenson's supervisor at one point, and submitted a document describing her complaints of discrimination and harassment. (Id. at 12, 14–15.) Soria informed Bennett that he was no longer the acting supervisor, but that he would contact the new area manager. (Id. at 14–16.) On January 22, Gloria Dodd, the new acting manager, called Bennett and left a voicemail. (Id. at 17.) Also on January 22, Bennett contacted the EEO counseling office and complained of verbal discrimination by her co-workers, the knife incident, the requirement that she perform additional duties, her lack of training opportunities, and the belittling that occurred at the January 2009 training session. (Bennett Dep., Vol. 1, Ex. 1.)

When Bennett returned Dodd's phone call the following week, Dodd asked Bennett to email her a summary of her complaint and permitted Bennett to use agency time to prepare this statement. (Dodd Decl. [Doc. No. 26] ¶ 6.) Bennett did not work on Tuesday, January 26, but emailed Dodd that afternoon. (Id. ¶ 7.) Her email stated that Cartmell had approached her from behind with a sharp object that looked like a knife, and had made stabbing motions with the object. (Bennett Dep. Vol. 3, Ex. 8.) She alleged that Cartmell stated that he wanted to kill someone and that she felt threatened for her life. (Id.) The email also alleged that Cartmell called Bennett "dumb" and "stupid" in front of a taxpayer, that the IRS made assignment and promotion decisions based on Bennett's race, and that the IRS was retaliating against her because she had complained about the discriminatory practices. (Id.) She requested "an immediate supervisor and/or position change." (Id.) Dodd set up an appointment to meet with Bennett at the St. Paul location on January 27. (Bennett Dep., Vol. 3 at 17–18; Dodd Decl. ¶ 9.)

5

Bennett claims that, during their meeting, she and Dodd discussed Bennett's issues with her performance review, as well as the alleged knife incident, and Dodd told Bennett that she should not go back to that environment.  (Bennett Dep., Vol. 3 at 18–22.)  Although Bennett had returned to the Bloomington location during the period of time between the knife incident and her meeting with Dodd, Cartmell had been on vacation since January 6.  (Id. at 25–27.  Accordingly, they never worked together after the knife incident.  (Id. at 26–27.)

Also during the meeting, Dodd contacted the Treasury Inspector General for Tax Administration to investigate Bennett's allegations, and Dodd temporarily reassigned Bennett to a different center.  (Dodd Decl. ¶¶ 10–11.)  Because Bennett felt that Stevenson, who supervised both the Minneapolis and Bloomington centers, was discriminating against her, Dodd reassigned Bennett to St. Paul.  (See id. ¶ 11.)  However, Bennett was reluctant to work out of that office because Cartmell's wife worked there.  (Id. ¶ 12.)  Bennett contends that Dodd should have moved Cartmell to a different office and that her failure to do so was more evidence of racial discrimination.  (Bennett Dep., Vol. 4 at 25–26.)

After this meeting, Bennett took leave time and did not report to the St. Paul center until February 16, 2010.  (See Dodd Decl. ¶¶ 15–17.)  Bennett worked in St. Paul for two days.  (Bennett Dep., Vol. 3 at 33–34.)  She asserts that, during that time, she encountered hostility from Cartmell's wife and from Sharon Torkelson, the supervisor.  (Bennett Dep., Vol. 4 at 65–67.)

Around February 19, Bennett was hospitalized with chest pain.  (Bennett Dep., Vol. 3 at 34.)  She was eventually diagnosed with congestive heart failure and has never

6

returned to work.  (Id. at 34–35.)  Bennett was granted FMLA leave through the summer of 2010 and, then, disability retirement from the IRS.  (See id. at 63–64, 68.)

Plaintiff filed this lawsuit in November 2012, asserting a claim for racial discrimination and harassment, and a claim for retaliation, all in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e-2000e-17.  Defendant moved for summary judgment on December 19, 2014.  Defendant submitted a supporting memorandum [Doc. No. 37], eight declarations [Doc. Nos. 20–27], and the complete deposition transcripts for Plaintiff and five other individuals [Doc. Nos. 28–36].  Plaintiff submitted an opposition memorandum [Doc. No. 40] and an affidavit [Doc. No. 41].  Defendant also filed a reply brief [Doc. No. 43].  The matter was heard on January 30, 2015.

**III.    DISCUSSION**

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 323.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of

7

his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Defendant seeks summary judgment on each of Plaintiff's claims.

### A. Race Discrimination and Harassment (Count I)

In Count I of her Complaint, Bennett asserts a claim for race discrimination and harassment under Title VII, 42 U.S.C. § 2000e-2(a). The Court will analyze these allegations separately.

#### 1. Discrimination

Discrimination claims are analyzed using the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). Under that analysis, a plaintiff asserting a discrimination claim bears the burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. Specifically, in this case, Bennett must establish that (1) she is a member of a protected group, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the employer did not take similar actions against employees who were not members of the protected class. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). If

Bennett establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. See Muor v. U.S. Bank Nat'l Ass'n, 716 F.3d 1072, 1076 (8th Cir. 2013). If such reason is offered, then Bennett must show that her employer's articulated reason was pretext for unlawful discrimination. See id.

### a. Jurisdiction

Defendant first argues that Bennett's discrimination claim arising out of (1) her assignment to Bloomington rather than St. Paul when she was promoted to Specialist; (2) Stevenson's failure to assign her to the Correspondence Project; and (3) her 2009 performance review are unexhausted and, therefore, the Court does not have jurisdiction to consider them. (Mem. in Supp. of Def.'s Mot. for Summ. J. [Doc. No. 37] ("Def.'s Supp. Mem.") at 24.) Bennett disputes Defendant's argument only with respect to her claims regarding Stevenson's failure to give Bennett access to special projects or special training. (See Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 40] ("Pl.'s Opp. Mem.") at 24–25.) She thus appears to concede that any claim arising out of her initial assignment to Bloomington and the 2009 performance review are unexhausted and, therefore, barred.

Title VII requires a federal employee bringing a discrimination claim to first exhaust his or her administrative remedies. 42 U.S.C. § 2000e-16(c). In particular, Bennett was required to "consult a[n EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). The regulations require Bennett to

9

consult with an EEO Counselor "within 45 days of the matter alleged to be discriminatory." Id. § 1614.105(a)(1). Bennett first contacted the EEO Counselor on January 22, 2010.

Bennett argues that her claims regarding special projects and training are timely because "[r]ight up to her last working day with the IRS, February 17, 2010, it could have provided her with these training opportunities." (Pl.'s Opp. Mem. at 24.) But she offers no authority for her theory that Defendant's alleged failure to assign her to projects or to give her training constitutes a continuing violation that would toll the running of the 45-day period, and the Court has found none. Bennett's request for EEO counseling was far outside the 45-day period for her claims regarding training and projects, her assignment to Bloomington, and her 2009 performance review, and Bennett failed to exhaust her administrative remedies for these claims. Accordingly, Defendant's motion on this point is granted.

### b.     Prima facie case

One element of Bennett's prima facie case of discrimination is that she must have suffered an actionable adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Rester v. Stephens Media, LLC, 739 F.3d 1127, 1131 (8th Cir. 2014) (quotation omitted). Bennett's only contention regarding the adverse employment action element of her prima facie case of discrimination is that she was denied "the specialized training and special project opportunities that would allow her to obtain promotions and gain overtime benefits." (Pl.'s Opp. Mem. at 21.) She contends that these actions "negatively impacted [her] future career prospects and prevented her from earning overtime pay." (Id.)

As discussed above, Bennett's claims regarding special projects and specialized training are unexhausted and the Court is without jurisdiction to consider them. Even if these claims were exhausted, however, any changes to Bennett's working conditions did not produce a "materially significant disadvantage." Clegg v. Ark. Dep't of Correction, 496 F.3d 922, 926 (8th Cir. 2007). Bennett relies heavily on Clegg v. Arkansas Dep't of Correction for her argument on this point, but Clegg is unavailing. In Clegg, a prison counselor contended that she was discriminated against on the basis of race and sex in several ways: her duties were altered or reassigned, she received a poor performance evaluation, her employer failed to provide her with the equipment necessary for her to be productive, and she was denied training. Id. at 927. The Eighth Circuit agreed with the district court that these claims did not establish any adverse employment action. Id. In particular, the appeals court noted that the "denial of a training request, without something more, is not itself an adverse employment action." Id. at 928 (citing Higgins v. Gonzales, 481 F.3d 578, 585 (8th Cir. 2007)). Similarly, the alleged denials of training and assignment to special projects in Bennett's case are insufficient to constitute an adverse employment action. Accordingly, Bennett's discrimination claim fails, and Defendant's motion is granted as to the allegations of race discrimination in Count I.

### 2. Harassment or hostile work environment

Title VII's prohibition on racial discrimination in employment includes a prohibition on "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A workplace is hostile under Title VII when it is "permeated with 'discriminatory intimidation, ridicule, and insult.'" Id. (quoting Meritor

Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).  In other words, a Title VII plaintiff must establish that the harassment she alleges was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  Meritor Sav. Bank, 477 U.S. at 67.  "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."  Harris, 510 U.S. at 23.  Such circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.

Defendant argues that Bennett has failed to establish a hostile work environment because she has no proof that the January 5, 2010, incident occurred.  (See Def.'s Supp. Mem. at 35.)  However, even if that were true, Bennett's claim of harassment does not depend solely on the knife incident, but also includes what she alleges to be Cartmell's repeated verbal harassment and her supervisor's alleged indifference to her complaints about that harassment.  And, taking the evidence in the light most favorable to Bennett, as the Court is required to do when considering a motion for summary judgment, she has raised a genuine issue of fact as to whether she suffered harassment and whether that harassment was sufficiently severe or pervasive to be actionable under Title VII.  Most notably, even Stevenson's notes from February 2010 demonstrate that Bennett complained about Cartmell and "interpersonal issues" on several occasions.  While Defendant seeks to cast doubt on the veracity of Bennett's story, credibility determinations are not appropriate on a paper record.  Defendant's motion regarding the harassment component of Count I must, therefore, be denied.

### B.     Retaliation (Count II)

In Count II of her Complaint, Bennett asserts a claim for retaliation under Title VII, 42 U.S.C. § 2000e-3(a). Title VII makes it unlawful for an employer to retaliate against an employee for exercising her rights under those statutes. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . ."). To establish a prima facie case of retaliation, Bennett must demonstrate that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity. Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997). The McDonnell Douglas burden-shifting framework discussed above with respect to Bennett's discrimination claim applies with equal force to her retaliation claim. See Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1042–43 (8th Cir. 2007).

Bennett contends that she engaged in protected activity by complaining to Stevenson about Cartmell's racial harassment and Stevenson's failure to give Bennett training and projects. (See Pl.'s Opp. Mem. at 25–26.) She also complained to Soria and Dodd about racial harassment, and then filed for EEO counseling and ultimately filed an EEOC charge. (See id. at 26.) Defendant argues that Bennett cannot rely on any alleged protected activity that occurred before she filed for EEO counseling because she testified in her deposition that her retaliation claim was limited to her filing of the EEOC complaint. (See Def.'s Supp. Mem. at 38–39; Bennett Dep., Vol. 3 at 63.) But Bennett's

13

EEOC complaint, filed in late-February 2010, does not limit her retaliation allegations to her filing for EEO counseling in January 2010. Rather, that complaint states that Bennett believed that her supervisor had retaliated against her "because [she had] complained about discrimination and unfairness by using the kind of employment practices that have a negative effect on [her] race, color, and age." (Bennett Dep., Vol. 1, Ex. 5 at 3.)

Nevertheless, Bennett's retaliation claim fails because she has not established that she suffered an actionable adverse employment action. According to Bennett, the adverse employment actions she suffered in retaliation for her protected activity were: (1) Dodd's refusal to move Cartmell rather than Bennett after the alleged knife incident; (2) Dodd's limiting Bennett's transfer options "because the supervisor who discriminated against her . . . was in the Minneapolis location and the wife of the perpetrator was in the St. Paul location"; (3) dragging out the investigation to force Bennett to go months without pay; and (4) eventually forcing Bennett to take disability retirement. (Pl.'s Opp. Mem. at 27.) Bennett argues that all of these actions culminated in her constructive discharge. (Id.)

As an initial matter, Bennett's opposition memorandum is her first mention of the IRS's allegedly "dragging out" the investigation as an adverse employment action in this case. Bennett may not amend her pleadings in her opposition to summary judgment, and the Court will not consider this allegation further.

In addition, Bennett's reliance on Dodd's actions to support her retaliation claim is misplaced. There could be no retaliation given that Bennett's allegedly discriminatory supervisor worked in one location and Cartmell's wife worked in the other location;

14

Dodd had no control over this situation and, therefore, it cannot support Bennett's claim. More importantly, however, Bennett's allegation that it was retaliatory for Dodd to move Bennett rather than Cartmell is belied by Bennett's own statements. Bennett alleged in her EEOC complaint that Dodd "immediately removed [her] from the Bloomington [center] for [her] physical safety." (Bennett Dep., Vol. 1, Ex. 5 at 3.) There is no allegation, or even insinuation, that Dodd's immediate removal of Bennett in response to Bennett's allegations regarding Cartmell was done in retaliation; rather, the only reasonable inference to be drawn from Dodd's actions was that Dodd wanted to protect Bennett.

Finally, Bennett has failed to establish that she was constructively discharged, or "forced" to take disability retirement. To establish constructive discharge, Bennett "must show that (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force her to quit." Rester, 739 F.3d at 1132 (citation and internal quotation marks omitted). "In addition, an employee must give her employer a reasonable opportunity to resolve a problem before quitting." Sanders v. Lee Cnty. Sch. Dist. No. 1, 669 F.3d 888, 893 (8th Cir. 2012).

The undisputed evidence shows that Bennett worked for a total of three days after reporting the alleged discrimination to Dodd. She has proffered no evidence that the working conditions during those days were intolerable. Nor has she established that anything other than her serious health condition led to her inability to return to work. Therefore, Bennett has not raised a genuine issue of material fact regarding constructive

discharge, and her retaliation claim fails.  Accordingly, Defendant's motion for summary judgment is granted as to Count II.

## IV. CONCLUSION

Bennett has failed to make out a prima facie case of discrimination or retaliation, but she has raised a genuine issue of fact as to her claim of a racially hostile work environment.

**THEREFORE, IT IS HEREBY ORDERED THAT** Defendant's Motion for Summary Judgment [Doc. No. 18] is **GRANTED IN PART AND DENIED IN PART**, consistent with this Order.

Dated:  March 10, 2015              s/Susan Richard Nelson
                                                                    SUSAN RICHARD NELSON
                                                                    United States District Judge